```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
THE BANK OF NEW YORK, in its capacity as      :
Indenture Trustee of the NextCard Credit Card :
Master Note Trust,                            :
                                              :
            Interpleader Plaintiff,           :     06 Civ. 13388 (CSH)
                                              :
      -against-                               :
                                              :
FIRST MILLENNIUM, INC., MILLENNIUM            :     MEMORANDUM OPINION
PARTNERS, L.P., RMK ADVANTAGE FUND,           :         AND ORDER
and FEDERAL DEPOSIT INSURANCE                 :
CORPORATION,                                  :
                                              :
            Interpleader Defendants.          :
-------------------------------------------------------------- x
```

HAIGHT, Senior District Judge:

In this interpleader action, several groups of investors and the Federal Deposit Insurance Corporation ("FDIC") assert competing claims to funds held by The Bank of New York ("BNY"). BNY holds those funds in its role as Indenture Trustee of the NextCard Credit Card Master Note Trust ("NextCard"), a trust that was established by NextBank, N.A. ("NextBank") as part of a securitization transaction. The investors—First Millennium, Inc., Millennium Partners, L.P. (together, "Millennium"), and RMK Advantage Fund ("RMK")—claim they are entitled to the funds because they hold notes issued by NextCard that have matured and become due and payable, but have not been fully paid. The FDIC claims that it is entitled to funds held by BNY based on its rights as the receiver of NextBank.

There are a number of pending motions in this case. Millennium and RMK have moved for the immediate distribution of the funds in the Spread Account, a portion of the interpleader assets held by BNY. The FDIC does not itself stake any claim to those funds, but contends that

Millennium and RMK are not entitled to receive them until they have surrendered their notes. Millennium/RMK and the FDIC assert competing claims to the interpleader assets beyond the Spread Account, and both sides have filed cross-motions for summary judgment regarding those assets. In addition, the FDIC has filed a motion for summary judgment on its counterclaims against BNY, and BNY has filed a motion for judgment on the pleadings with respect to those counterclaims. This Opinion resolves the motion for immediate distribution of funds in the Spread Account.

## I. BACKGROUND

### A. The Securitization Transaction

#### 1. Basic Structure

This action has its genesis in a securitization transaction undertaken by NextBank, a national banking association that issued consumer credit cards. In basic terms, NextBank "created a trust, transferred its receivables to this trust, ordered the trust to sell notes to investors, and used the proceeds to pay merchants for charges by credit card holders"; the trust then used receivables to repay the investors. *Bank of New York v. FDIC*, 453 F. Supp. 2d 82, 85-87 (D.D.C. 2006) ("*NextBank I*"). This securitization transaction was executed through a set of documents, including the Master Indenture, Indenture Supplements, and the Transfer and Servicing Agreement. Under these documents, NextBank (as "Transferor") transferred its receivables to NextCard, a Delaware statutory business trust. The trust (also referred to as the "Issuer") sold asset-backed notes (the "Notes") to investors (the "Noteholders"). In 2000 and 2001, the Issuer issued two series of notes: the 2000-1 Series Notes and the 2001-1 Series Notes. Each series included four classes of notes (Classes A, B, C, D) with differing levels of risk—from Class A, the lowest risk, to Class D, the

highest risk. Lower risk notes had higher priority of repayment, while higher risk notes offered higher interest rates. The Noteholders' loans were secured by collateral. BNY acts as Indenture Trustee of the trust, and represents the interests of the Noteholders in that capacity.

### 2. The Spread Account

Payments of interest and principal to the Noteholders were to be funded, in the first instance, by credit card receivables. However, it was possible that the credit card receivables allocated to the Noteholders would not cover the full amount of principal and interest due. (For example, such a shortfall could occur if there was a higher rate of cardholder defaults than expected.) In light of this possibility, the transaction established a Spread Account to provide credit enhancement for the Class C and Class D Notes. The Spread Account was initially funded with 4 percent of the proceeds from the sale of Notes at the beginning of the transaction, with monthly adjustments to the amount of funds in the account based on a formula set forth in the transaction documents. The funds transferred to the Spread Account were required to be invested in highly-rated investments, with ratings of at least A-1 by Standard & Poor's and P-1 by Moody's. Prior to final maturity of the Notes, funds in the Spread Account would be used to make monthly interest payments on the Class C and Class D Notes if collections of receivables allocated to those Notes were insufficient to make the required payments. Ex. 5 § 4.11(c) at 25-26; Ex. 6 § 4.11(c) at 26. Upon final maturity, funds in the Spread Accounts would be used to pay off unpaid initial principal—the Note Principal Balance—on the Notes. Ex. 5 § 4.11(d) at 26; Ex. 6 § 4.11(d) at 26-27.

### B. Subsequent Developments

Unfortunately, the transaction did not proceed as the participants had hoped. On February 7, 2002, the FDIC was appointed as NextBank's receiver because "NextBank's undercapitalization

and practice of extending credit to subprime borrowers had put the bank at risk for failure." *NextBank I*, 453 F. Supp. 2d at 85. The FDIC eventually closed the credit card accounts, and credit card holders paid down their existing balances. Class A and Class B Noteholders were fully repaid principal and interest. Class C and Class D Noteholders continued to receive interest payments; but due to substantial charge-offs, Class C Noteholders were repaid only about half their principal and Class D Noteholders were not repaid any principal. *NextBank I*, 453 F. Supp. 2d at 91. The amount of unpaid initial principal on the Series 2000-1 and Series 2001-1 Class C Notes is about $70 million, and on the Series 2000-1 and Series 2001-1 Class D Notes is $42 million—for a total unpaid initial principal of about $112 million.

In addition, the Notes are now fully "matured." The Final Maturity Date for the Series 2000-1 Notes was December 15, 2006, and for the Series 2001-1 Notes was April 16, 2007.

## II. DISCUSSION

### A. Distribution of the Funds in the Spread Account

Millennium and RMK contend that the funds in the Spread Account should be immediately distributed to the Noteholders pursuant to § 4.11(d) of the Indenture Supplements. That provision states:

> On the [] Final Maturity Date, the Indenture Trustee at the direction of the Servicer shall withdraw from the Spread Account an amount equal to the lesser of (i) the sum of the Class C Note Principal Balance and the Class D Note Principal Balance (after any payment to be made pursuant to subsection 4.04(c) on such date) and (ii) the Available Spread Account Amount and, if the Available Spread Account Amount is not sufficient to reduce the Class C Note Principal Balance and the Class D Note Principal Balance to zero, Investment Earnings credited to the Spread Account up to the amount required to reduce the Class C Note Principal Balance and the Class D Note Principal Balance to zero, and the Indenture Trustee or the Servicer shall deposit such amounts into the Collection Account for distribution first to the

> Class C Noteholders and then to the Class D Noteholders in accordance with subsections 5.02(e) and 5.02(g).

Ex. 5 § 4.11(d) at 26; Ex. 6 § 4.11(d) at 26-27. Because the Final Maturity Dates have passed and the Class C and Class D Note Principal Balance of about $112 million far exceeds the approximately $20 million in the Spread Account, Millennium and RMK contend that all of the funds in the Spread Account should be immediately placed into a collection account for the Noteholders; and then distributed to the Noteholders pursuant to §§ 5.02(e) and (g) of the Indenture Supplements. Those sections state:

> On each Distribution Date, the Paying Agent shall distribute to each [Class C / Class D] Noteholder of record on the related Record Date (other than as provided in Section 11.02 of the Indenture) such [Class C / Class D] Noteholders' *pro rata* share of the amounts held by the Paying Agent (including amounts held by the Paying Agent with respect to amounts withdrawn from the Spread Account (at the times and in the amounts specified in Section 4.11)) that are allocated and available on each Distribution Date to pay interest on the [Class C / Class D] Notes pursuant to this Indenture Supplement.

Ex. 5 § 5.02(e), (g) at 28-29; Ex. 6 § 5.02(e), (g) at 29-30. Because the amounts owed to Class C Noteholders far exceeds the amounts in the Spread Account (and because Class C Noteholders have priority to receive these funds over Class D Noteholders), only Class C Noteholders will receive distributions from the Spread Account.

The FDIC does not dispute that, pursuant to § 4.11 of the Indenture Supplements, the Noteholders are ultimately entitled to the funds in the Spread Account. However, the FDIC contends that the Noteholders must surrender their Notes pursuant to § 11.02 of the Master Indenture in order to obtain those funds. That provision states:

> (a) The Servicer shall give the Indenture Trustee at least thirty (30) days prior notice of the Distribution Date on which the Noteholders of any Series or

> Class may surrender their Notes for payment of the *final distribution* on and cancellation of such Notes (or, in the event of a *final distribution* resulting from the application of Section 2.06, 6.01 or 7.01 of the Transfer and Servicing Agreement, notice of such Distribution Date promptly after the Servicer has determined that a *final distribution* will occur, if such determination is made less than thirty (30) days prior to such Distribution Date). Such notice shall be accompanied by an Officer's Certificate setting forth the information specified in Section 3.05 of the Transfer and Servicing Agreement covering the period during the then-current calendar year through the date of such notice. Not later than the fifth day of the month in which the *final distribution* in respect of such Series or Class is payable to Noteholders, the Indenture Trustee shall provide notice to Noteholders of such Series or Class specifying (i) the date upon which *final payment* of such Series or Class will be made upon presentation and surrender of Notes of such Series or Class at the office or offices therein designated, (ii) the amount of any such *final payment* and (iii) that the Record Date otherwise applicable to such payment date is not applicable, payments being made only upon presentation and surrender of such Notes at the office or offices therein specified (which, in the case of Bearer Notes, shall be outside the United States). The Indenture Trustee shall give such notice to the Transfer Agent and Registrar and the Paying Agent at the time such notice is given to Noteholders.
>
> (b) Notwithstanding a *final distribution* to the Noteholders of any Series or Class (or the termination of the Trust), except as otherwise provided in this paragraph, all funds then on deposit in the Collection Account and any Series Account allocated to such Noteholders shall continue to be held in trust for the benefit of such Noteholders and the Paying Agent or the Indenture Trustee shall pay such funds to such Noteholders upon surrender of their Notes, if certificated (and any excess shall be paid in accordance with the terms of any Enhancement Agreement). . . .

Ex. 2, § 11.02 (emphasis added).[1]

Whether § 11.02 of the Master Indenture applies to the distribution of Spread Account funds

---

[1] Millennium argues that the FDIC's argument suffers from "technical infirmities" because the notice requirements under Section 11.02 for distribution of the "final payment" were not complied with prior to the Final Maturity Dates. But the funds in the Spread Account could not be distributed on the Final Maturity Dates as originally scheduled because the Court issued an injunction preventing BNY from making any distribution of the *res* in this interpleader action pending a further order from this Court. Thus, the absence of notice of "final payment" relating to the originally scheduled distributions does not resolve the matter at hand.

to Noteholders upon final maturity turns on whether such distributions are the "final payment" (or "final distribution," the two terms appear to be synonymous) on the Notes. And this question is directly linked to the parties' entitlement to the interpleader assets beyond the Spread Account, the subject of cross-motions for summary judgment by Millennium/RMK and the FDIC. If the Noteholders are entitled to interpleader assets beyond the Spread Account, as Millennium and RMK argue, then the Spread Account payment is not the final payment—and the Noteholders should obtain the Spread Account funds immediately, without having to surrender their Notes. But if the Noteholders are entitled to nothing beyond the Spread Accounts, as the FDIC argues, then the Spread Account payments are the final payment—and the Noteholders must surrender their Notes to obtain payment.

However, the Court is not yet prepared to resolve the parties' cross-motions for summary judgment regarding the interpleader assets beyond the Spread Account. The question thus becomes whether, with a determination of whether the Noteholders are entitled to funds beyond the Spread Account *pending*, the Noteholders must surrender their Notes to receive the funds in the Spread Account. This question is not clearly answered by the text of the contract (because the procedure mandated by the contract for distribution of the Spread Account funds will only become clear *after* the Court has determined whether the Noteholders are entitled to any funds beyond the Spread Accounts).

The FDIC argues that the distribution of Spread Account funds should be treated as the "final payment" on the Notes, with the following result:

> The Noteholders have a choice: either they surrender the Notes to receive the remaining funds in the Spread Accounts or they defer payments of those funds to pursue other funds in this litigation. If the Noteholders want the

> funds in the Spread Account now, then they must first surrender the Notes as required by the Transaction Documents. But if the Noteholders surrender the Notes, then they will lack standing to pursue claims under the Notes and will render any such claims moot.

FDIC's Br. in Opp'n to the Noteholders' Aug. 27, 2007 Letter ("FDIC Spread Account Opp'n Br.") at 22-23. In other words, the FDIC argues that the final payment surrender provision in § 11.02 of the Master Indenture effectively conditions the Noteholders' receipt of the Spread Account funds (which were to be distributed upon Final Maturity) upon abandoning (or exhausting) their attempts to recover further amounts of the initial unpaid principal.[2] But I conclude that such an application of § 11.02 is unwarranted under the present circumstances because it would undermine the Noteholders' substantive right to obtain the funds from the Spread Account upon Final Maturity and the Noteholders' procedural right to bring suit to recover amounts owed on the Notes, without furthering the underlying purpose of § 11.02.

The aggressive application of § 11.02 urged by the FDIC does not reflect the underlying purpose of the provision. There is no indication that this provision was meant to penalize or discourage Noteholders from litigating for principal after maturity of the Notes. Rather, the FDIC explains: "The surrender requirement is common in transactions such as this, especially where tens of millions of dollars are at stake. The parties to the transaction need a means of verifying that notes are not circulating after having been paid such that another entity could claim amounts owed." FDIC Spread Account Opp'n Br. at 19. But such concerns of double payment are only weakly implicated, if at all, under the present circumstances. As noted above, because the amount owed to the Class C Noteholders far exceeds the funds in the Spread Account, only Class C Noteholders will receive

---

[2] The FDIC's characterization of the Noteholders' "choice" should perhaps be amended to "Hobson's Choice."

8

distributions from the Spread Account. The Class C Notes are held in global form with Cede & Co., the nominee for the clearing house The Depository Trust Company. This arrangement prevents laundering or trafficking of repaid notes, whereby the notes could be used twice to obtain double payment. Furthermore, the Class C Notes provide that any payments of principal on the Notes shall reduce the outstanding principal on the Notes and be binding upon all future holders of such Notes. *See* Ex. M; Ex. N. Thus, distribution of the funds in the Spread Account does not place the Issuer at risk for future demands for amounts already paid on the Class C Notes.

In contrast, § 4.11(d) of the Indenture Supplement is intended to provide Class C and Class D Noteholders with credit enhancement by allowing them to obtain distributions from the Spread Accounts (up to the amount of unpaid initial principal) upon the Final Maturity Date. That credit enhancement is impaired by a delay in the distribution of Spread Account funds. Furthermore, §5.05(a)(i) of the Master Indenture permits the Noteholders to institute proceedings for collection of amounts payable on the Notes, while § 5.08 of the Master Indenture states that each Noteholder shall have an "absolute and unconditional" right "to institute suit for the enforcement" of payments of principal that is due, and that such right "shall not be impaired without the consent" of the Noteholder. Ex. 2 § 5.05(a)(i), § 5.08. Regardless of whether the Noteholders are ultimately entitled to further funds, I conclude that applying § 11.02 as urged by the FDIC—so as to condition the Noteholders' receipt of the Spread Account funds upon abandoning (or exhausting) their attempts to recover further amounts of the unpaid initial principal—tends to impair and undermine the Noteholders' procedural right to bring suit for principal due on the Notes.

Thus, under the present circumstances, with a determination of whether the Noteholders are entitled to funds beyond the Spread Account pending, I conclude that it is appropriate for the funds

in the Spread Account to be immediately distributed to the Noteholders pursuant to § 4.11(d) and §§ 5.02(e), (g) of the Indenture Supplement; *provided that*, if the Court ultimately determines that the Noteholders are *not* entitled to funds beyond the Spread Account and that the funds in the Spread Account are thus the "final payment" on the Notes, the Noteholders will be ordered by the Court to surrender their Notes. This approach will adequately protect the interests reflected in § 11.02 of the Master Indenture without undermining the Noteholders' substantive right to credit enhancement from the Spread Account funds and their procedural right to bring suit to recover amounts due on the Notes.

**B.     Fees and Expenses**

In its Proposed Order, Millennium requests that funds in the Spread Account first be used to repay enforcement costs incurred by the BNY, Millennium, and RMK, before being distributed to the Class C and Class D Noteholders. The Proposed Order states:

> . . . it is hereby ORDERED that the Bank of New York ("BONY"), in its capacity as the indenture trustee (the "Indenture Trustee"), distribute all monies held by BONY in the "Spread Accounts" . . . as follows:
>
> (a) for the reimbursement of the out-of-pocket fees and expenses of the Indenture Trustee and each of the Noteholder Interpleader Claimants comprised of (i) the fees and expenses incurred by BONY, as the Indenture Trustee, and each of the Noteholder Interpleader Claimants in connection with the litigation in the United States District Court for the District of Columbia (and appeals thereof), which fees and expenses have not been reimbursed from the collateral held by the Indenture Trustee, and (ii) the fees and expenses incurred by the Indenture Trustee and the Interpleader Noteholders (as defined in the Indenture) in connection with this Interpleader Action and related litigation in the United States District Court for the District of Columbia (and appeals thereof); and
>
> (b) to such persons who are Class C and Class D noteholders of record as of the date of this Order all monies remaining in the Spread Accounts, after payment of the sums pursuant to subparagraph (a) above, in accordance with

> the allocations provided for in the Indenture; and
>
> IT IS HEREBY FURTHER ORDERED that, prior to making any of the aforementioned payments, BONY shall (a) provide fifteen (15) days notice of this Order to each person who is a Class C or Class D Noteholder of record as of the date of this Order in the manner called for in the Indenture and the actual allocation of the Spread Accounts proposed to be made pursuant to the terms of this Order, and (b) direct that any Noteholder having an objection to the terms of this Order file an objection of record before this Court in this action, which objection shall be resolved by this Court.

Ex. L.

On the present record, the Court declines to issue an order directing distribution of the funds in the Spread Account in the manner proposed by Millennium. The "out-of-pocket fees and expenses" incurred to date by the Indenture Trustee and the Noteholder interpleader claimants must be substantial. Presumably the noun "fees" is intended to include attorneys' fees. The requested reimbursement covers not only litigation in this Court but the protracted litigation in the District of Columbia, followed by an appeal to the D.C. Circuit. If all these fees and expenses are deducted from the Spread Account funds before any *pro rata* distribution is made to Noteholders, the distributions to Noteholders who did not participate in this two-front litigation will be reduced, perhaps significantly.

Perhaps these requested reimbursements are proper and should be allowed. But Millennium has failed entirely to articulate any basis, derived from the transaction documents or principles of law or equity, to justify the reimbursement of fees and costs off the top of the Spread Account funds before any distribution is made to Noteholders. The provision in the Proposed Order that others concerned in the distribution have 15 days to object to it does not provide an adequate safeguard, in the absence of any showing by Millennium that it is entitled to be reimbursed from the Spread

11

Account funds for the fees and expenses in question.

In these circumstances, the proper procedure is to direct counsel for Millennium and RMK, which have prevailed on this motion, to settle a distribution order on notice. If Millennium and RMK wish to press their claims for reimbursement of fees and expenses before Spread Account funds are distributed to Noteholders, they must accompany their proposed order with a memorandum of law or other supporting papers demonstrating their entitlement to that reimbursement. Notice of settlement must be given to all Class C and Class D Noteholders of record and include copies of this Opinion and the accompanying proposed order. BNY and other Class C and Class D Noteholders, if so advised, may file and serve counter-orders, supported by memoranda of law or other papers. On the return date of the distribution order, counsel for Millennium must demonstrate by affidavit that the required notice of settlement was given.

### III. CONCLUSION

For the above reasons, Millennium and RMK's motion for immediate distribution of the funds in the Spread Account is granted; provided that, if the Court ultimately determines that the Noteholders are not entitled to funds beyond the Spread Account, the Noteholders will be ordered by the Court to surrender their Notes. Counsel for Millennium and RMK are directed to settle a distribution order on notice in the manner described above.

It is SO ORDERED.

Dated: New York, New York
March 26, 2008

_____
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE