UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

THE BANK OF NEW YORK, in its capacity as  :
Indenture Trustee of the NextCard Credit Card  :
Master Note Trust,  :
   :
     Interpleader Plaintiff,  :
   :
   -against-  :
   :
FIRST MILLENNIUM, INC., MILLENNIUM  :
PARTNERS, L.P., RMK ADVANTAGE FUND,  :
and FEDERAL DEPOSIT INSURANCE  :
CORPORATION,  :
   :
     Interpleader Defendants.  :

------------------------------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/24/09

06 Civ. 13388 (CSH)

MEMORANDUM OPINION
AND ORDER

HAIGHT, Senior District Judge:

   In this interpleader action, several groups of private investors and the Federal Deposit

Insurance Corporation ("FDIC"), all interpleader defendants, assert competing claims to funds held

by interpleader plaintiff The Bank of New York ("BNY"). BNY holds those funds in its role as

Indenture Trustee of the NextCard Credit Card Master Note Trust ("NextCard"), a trust that was

established by NextBank, N.A. ("NextBank") as part of a securitization transaction. The

investors—First Millennium, Inc., Millennium Partners, L.P. (together, "Millennium"), and RMK

Advantage Fund ("RMK")—claim they are entitled to the funds because they hold notes issued by

NextCard that have matured and become due and payable, but have not been fully paid. The FDIC

claims that it is entitled to funds held by BNY based on its rights as the receiver of NextBank.

1

The Court has resolved several motions in this case. It granted Millennium and RMK's motion for the immediate distribution of the funds in the Spread Account, a portion of the interpleader assets held by BNY. *See Bank of New York v. First Millennium, Inc.*, 2008 WL 793627 (S.D.N.Y. Mar. 26, 2008). In addition, the Court granted BNY's motion for judgment on the pleadings on the FDIC's counterclaims against BNY. *See Bank of New York v. First Millennium, Inc.*, 2008 WL 953619 (S.D.N.Y. Apr. 8, 2008). Familiarity with those opinions is assumed. This Opinion addresses the key remaining issue: the competing claims of the FDIC and of Millennium and RMK to the non-Spread Account interpleader funds, which total approximately $50 million. The parties have filed cross-motions for summary judgment to recover those assets.

## I. BACKGROUND

### A. The Securitization Transaction

#### 1. Basic Structure

This action has its genesis in a securitization transaction undertaken by NextBank, a national banking association that issued consumer credit cards. In basic terms, NextBank "created a trust, transferred its receivables to this trust, ordered the trust to sell notes to investors, and used the proceeds to pay merchants for charges by credit card holders"; the trust then used receivables to repay the investors. I have quoted from Judge Huvelle's meticulous and informative opinion in *Bank of New York v. FDIC*, 453 F. Supp. 2d 82, 85-87 (D.D.C. 2006), *aff'd*, 508 F.3d 1 (D.C. Cir. 2007), resolving claims between BNY and the FDIC, which recites much of the background relevant to these motions before this Court.

For purposes of the case at bar, one begins with the observation that the securitization transaction was executed through a set of documents, including the Master Indenture, Indenture

2

Supplements, and the Transfer and Servicing Agreement. Under these documents, NextBank (as "Transferor") transferred its receivables to NextCard, a Delaware statutory business trust. The trust (also referred to as the "Issuer") sold asset-backed notes (the "Notes") to investors (the "Noteholders"). In 2000 and 2001, the Issuer issued two series of notes: the 2000-1 Series Notes and the 2001-1 Series Notes. Each series included four classes of notes (Classes A, B, C, D) with differing levels of risk—from Class A, the lowest risk, to Class D, the highest risk. Lower risk notes had higher priority of repayment, while higher risk notes offered higher interest rates. The Noteholders' loans were secured by Collateral.[1] BNY acts as Indenture Trustee of the trust.

## 2.    General Structure of Ownership, Allocation, and Distribution of Receivables

Under the transaction, NextCard owned the credit card Receivables—amounts owed by credit card holding consumers to pay off their NextBank credit card bills. Ex. 2 (Master Indenture) at 1; Ex. 3 (Transfer and Servicing Agreement) at 15. These Receivables included finance charge payments and principal payments owed by cardholders. If credit card holders did not make payments on their accounts within a certain period of time, however, the delinquent receivables in those accounts were considered defaulted.[2]

The funds generated by the Receivables were allocated between Collateral (for the Noteholders) and Transferor Interest (for NextBank), and periodically distributed to the Noteholders

---

[1] The Collateral essentially consisted of certain receivables allocated to the Noteholders plus a separate fund for the Noteholders called the Spread Account.

[2] The Transfer and Servicing Agreement explains that "Defaulted Receivables" are "all Principal Receivables which are charged off as uncollectible . . . in accordance with the Credit Card Guidelines and the Servicer's customary and usual servicing procedures," and notes that receivables will generally be treated as defaulted if they are delinquent by 180 days. Ex. 3 (Transfer and Servicing Agreement), § 1.01, at 3-4.

and NextBank.[3] Article IV of the Indenture Supplement sets forth the general structure of the Issuer's allocations and distributions of the finance charge payments and principal payments collected from the credit card holders.

Article IV specifies certain allocations and distributions to Noteholders from the collections of Receivables. At each Deposit Date, a certain percentage—called the Investor Percentage—of finance charge collections and principal collections was allocated to the Noteholders. Ex. 5 (Indenture Supplement), § 4.01, at 15. The Investor Percentage was a function of, *inter alia*, the Invested Amount, which was defined as the initial principal *minus* the principal paid to the Noteholders *minus* unreimbursed investor charge-offs.[4] *Id.*, § 2.01, at 7. Specifically, the Investor Percentage was defined as a fraction, the numerator of which was the Invested Amount. *Id.*, § 2.01, at 6-8. Thus, if the Invested Amount was zero, the Investor Percentage would also be zero (and none of the collections from the Receivables would be allocated as Collateral for the Noteholders).

On each Distribution Date, finance charge collections allocated to the Noteholders were used to make payments of monthly interest. Ex. 5 (Indenture Supplement), § 4.04(a), at 19. The principal collections allocated to the Noteholders were used in different ways during different periods: (1) during the initial Revolving Period, these amounts were used to fund the creation of additional credit card receivables and were not used to repay principal on the Notes; (2) during the Controlled

---

[3] Thus, the Transferor Interest is separate and excluded from the Collateral. Ex. 2 (Master Indenture) at 1-2.

[4] As noted earlier, delinquent receivables were considered defaulted if credit card holders did not make payments on their accounts within a certain period of time. A portion of these defaulted receivables was allocated to each series of Notes as "Investor Charge-Offs." Some funds from finance charge collections were used to offset these investor charge-offs, but the unreimbursed investor charge-offs reduced the Invested Amount as described in text.

4

Accumulation Period, these amounts were deposited into a funding account to be used to repay the principal amounts of the Notes; and (3) during an Early Amortization Period, which commenced upon the occurrence of a Redemption Event, these amounts were used to repay principal on the Notes. *Id.*, § 4.04 (b), ©, at 20-21.

In addition, NextBank (and later the FDIC) was entitled to receive periodic distributions of Transferor Interest from the collections.[5] On each Deposit Date, a certain percentage—the Transferor Percentage—of collected finance charge receivables and principal receivables was paid to the Transferor. Ex. 5 (Indenture Supplement), § 4.01(b), at 15. The Transferor Percentage was defined as 100% *minus* the aggregate Investor Percentage for that category of receivables. Ex. 2 (Master Indenture), § 1.01, at 13. During the Revolving Period, the Transferor Percentage was set at 9%. Thus, during that period, collections on the Receivables were divided, with 91% (representing the Collateral portion of the assets) paid to the Noteholders or used to fund new credit card purchases and 9% (representing the Transferor Interest portion of the assets) paid to NextBank as its Transferor Interest distribution. However, if the Investor Percentage subsequently went down (due to unreimbursed Investor Charge-Offs, for example), then the Transferor Percentage—and the resulting Transferor Interest payments based on that percentage—would go up.

## 3. The Spread Account

The transaction established a Spread Account to provide credit enhancement for the Class

---

[5] In its briefs, the FDIC asserts that the Transferor Interest was "a portion of the receivables as to which NextBank retained ownership." FDIC Br. in Support of Cross-Mot. for S.J. at 5. But the transaction documents plainly establish that NextBank as the Transferor "conveyed to the Issuer all of its right, title and interest in, to and under the Receivables." Ex. 2 (Master Indenture) at 1, Ex. 3 (Transfer and Servicing Agreement) at 15. Therefore, the Issuer "owns" the receivables, while the FDIC, as successor to NextBank, possesses a right to receive Transferor Interest payments from the Issuer.

C and Class D Noteholders in case collections from the credit card receivables failed to cover the full amount of principal and interest due to them. Prior to Final Maturity of the Notes, funds in the Spread Account would be used to make monthly interest payments on the Class C and Class D Notes if collections of receivables allocated to those Notes were insufficient to make the required payments. Ex. 5 (Indenture Supplement), § 4.11©, at 25-26. Upon Final Maturity, funds in the Spread Accounts would be used to pay off unpaid initial principal—or the Note Principal Balance—on the Notes. *Id.*, § 4.11(d) at 26.

## B.    Subsequent Developments

Unfortunately, the transaction did not proceed as the initial participants had hoped. On February 7, 2002, the FDIC was appointed as NextBank's receiver because "NextBank's undercapitalization and practice of extending credit to subprime borrowers had put the bank at risk for failure." *Bank of New York v. FDIC*, 453 F. Supp. 2d 82, 85 (D.D.C. 2006). Under Section 5.01 of the Master Indenture, receivership of NextCard was a Redemption Event, which triggered early amortization. However, the FDIC determined that this "ipso facto clause" in the Master Indenture was unenforceable against the FDIC in light of the Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183 (1989),[6] and "the FDIC continued to use the Noteholders' capital for several months to pay merchants for new purchases by NextBank credit card holders." *Id.* at 90-91. "On July 10, 2002, the FDIC notified BNY that NextBank's securitized credit card portfolio had failed to meet a financial performance threshold, which triggered early amortization under the Master Indenture independently of the ipso facto

___

[6] FIRREA is codified at various locations in the United States Code. Congress enacted FIRREA as a response to a crisis in the savings and loan industry, and for the purpose of remedying problems Congress perceived to result from the then existing regulatory scheme.

clause." *Id.* at 91. The FDIC then closed the credit card accounts, thereby prohibiting card holders from making new charges; they were supposed to pay down their existing balances.

Class A and B Noteholders were fully repaid principal and interest. Class C and D Noteholders continued to receive interest payments; but due to substantial charge-offs, the Invested Amount for those Notes decreased rapidly—and the related principal payments were limited as a result.[7] The Invested Amount has been zero for the Series 2000-1 Class D Notes since February 2003, for the Series 2001-1 Class D Notes since April 2003, and for the Series 2000-1 and Series 2001-1 Class C Notes since June 2006.[8] As a result of these developments, Class C Noteholders were repaid only about half their principal and Class D Noteholders were not repaid any principal prior to this litigation. *Bank of New York v. FDIC*, 453 F. Supp. 2d 82, 91 (D.D.C. 2006).

The amount of unpaid initial principal—or the amount of initial principal *minus* the amount of principal paid to Noteholders—is defined as the Note Principal Balance. Ex. 5 (Indenture Supplement), § 2.01, at 3-5, 9. At the start of this litigation, the Note Principal Balance on the Series 2000-1 and Series 2001-1 Class C Notes was approximately $70.1 million, and on the Series 2000-1 and Series 2001-1 Class D Notes was $42 million. The Court's recent orders regarding the funds in the Spread Accounts have resulted in the distribution of approximately $23.6 million to Class C Noteholders. Thus, the present Note Principal Balance on the Class C Notes is about $46.5 million.

---

[7] As noted above, the Invested Amount was defined as the initial principal *minus* the principal paid to the Noteholders *minus* unreimbursed investor charge-offs. Thus, unreimbursed investor charge-offs reduce the Invested Amount. Furthermore, under Article IV of the Indenture Supplement, the percentage of finance charge collections and principal collections allocated to the Noteholders is linked to the Invested Amount; and if the Invested Amount falls to zero, then none of the collections are allocated (or distributed) to the Noteholders.

[8] After the Invested Amount became zero, all of the collections from Receivables were allocated to Transferor Interest, and none to Collateral.

The Notes are now fully "matured." The Final Maturity Date for the Series 2000-1 Notes was December 15, 2006, and for the Series 2001-1 Notes was April 16, 2007.

## C. Competing Theories of Entitlement to the Interpleader Assets

The interpleader assets presently consist of approximately $50 million from Receivables and proceeds of Receivables. The parties have presented strikingly divergent accounts of how, upon Final Maturity, the remaining interpleader assets should be distributed under the terms of the transaction documents. I will briefly summarize the parties' competing theories.

According to Millennium, prior to the Final Maturity Date (or an Event of Default), the periodic distributions due to the Noteholders depended upon the collections of Receivables allocated to each Series of Notes; and these payments were limited by the concept of Invested Amount (and Collateral).[9] However, upon the Final Maturity Date, the entire Note Principal Balance became due and payable—and the Noteholders had an "absolute and unconditional" right to such amounts. Thus, the Noteholders may recover unpaid principal from the *assets* of the Issuer, not merely from the Collateral. Furthermore, the distribution waterfall for such recoveries entitles the Noteholders to receive full payment of interest and principal before further Transferor Interest distributions are made to the FDIC.

The FDIC presents a very different theory of the transaction. According to the FDIC, investor charge-offs not only reduced the periodic distributions to Noteholders, but actually caused the Noteholders' principal to be written down. As a result, the "unpaid principal" due and payable

_____

[9] Millennium characterizes the Notes during this period as "a pass through facility, whereby payments were made on a cash flow basis, dependent upon the payments received from collateral allocated to each Series of Notes." Millennium's Memorandum of Law in Support of Motion for Summary Judgment Regarding Interpleader Assets ("Millennium's Br.") at 2.

8

on the Final Maturity date was only the Invested Amount (and the amounts in the Spread Accounts)—and not the Note Principal Balance. Furthermore, the Issuer's obligation to pay principal or interest on the Notes is limited by recourse only to the Collateral.[10]  Thus, the Noteholders are entitled to recover funds only from the Spread Accounts, and no more; while the FDIC is entitled to the remaining Receivables as Transferor Interest. Finally, once the Noteholders' rights to receive payment from the Issuer ended (on the Final Maturity Date), the FDIC was entitled to terminate the trust and to obtain all right and interest in the Receivables.

## II. APPLICABLE LEGAL STANDARDS

### A.    Standard of Review on Motions for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). When cross-motions for summary judgment are filed, "the standard is the same as that for individual motions for summary judgment." *Natural Res. Def. Council v. Evans*, 254 F. Supp. 2d

---

[10] The Collateral essentially equals the Invested Amount plus the funds in the Spread Account. Because the Invested Amount has fallen to zero, the Collateral has been reduced to the funds in the Spread Account.

9

434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id.* (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## B. Contract Interpretation under New York Law

The transaction documents in this case are governed by New York law. Ex. 2 (Master Indenture), § 12.13, at 68; Ex. M, Ex. N (Class C Notes); Ex. 19 (Class D Note). Therefore, I review general principles of contract interpretation under New York law.

The New York Court of Appeals has explained: "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. The best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (citations and quotations omitted). "Where . . . the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *Rainbow v. Swisher*, 72 N.Y.2d 106, 109 (1988). But "if the court finds that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *British Int'l Ins. Co. v. Seguros LA Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003) (construing New York law) (citations and quotations omitted).

A contract is ambiguous if its terms are "susceptible to more than one reasonable interpretation." *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004); *see also British Int'l Ins. Co. v. Seguros LA Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003) ("An ambiguity exists where the

terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") (citations and quotations omitted). The New York Court of Appeals has explained: "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion. Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (citations and quotations omitted).

Under New York law, a contract "should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (citations and quotations omitted). "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible. Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992); *see also Columbus Park Corp. v. Dep't of Hous. Pres. & Dev.*, 80 N.Y.2d 19, 31 (1992) ("a construction which makes a contract provision meaningless is contrary to basic principles of contract interpretation"). In interpreting contract terms, "the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency." *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1991) (citations and quotations omitted).

11

## III. DISCUSSION

As noted above, the parties have presented strikingly divergent accounts of how the remaining interpleader assets should be distributed based on the transaction documents. In particular, the parties disagree about two fundamental aspects of the transaction: (1) what sum was due and payable upon the Final Maturity Date, and (2) whether recourse on amounts due and payable under the Notes is limited to the Collateral. I consider those two issues in turn.

## A.    The Sum Due and Payable Upon the Final Maturity Date

The Class C and Class D Notes state: "The entire unpaid principal amount of this [] Note shall be due and payable on the earlier of the Stated Maturity Date and the Redemption Date, if any." Ex. M, Ex. N (Class C Notes); Ex. 19 (Class D Note).[11] Millennium argues that "entire unpaid principal amount" means the Note Principal Balance, or the unpaid initial principal.[12] The FDIC, on the other hand, contends that the "entire unpaid principal amount" due on Final Maturity is limited to the Invested Amount or the Collateral.[13]

The plain meaning of the phrase "entire unpaid principal amount" supports Millennium's position, as that phrase can easily be understood as referring to the amount of initial principal that has not been paid to the Noteholders. The FDIC contends that "principal" in this phrase takes into account "principal write-offs" due to unreimbursed investor charge-offs. But this argument conflates

---

[11] The Class D Notes say "Final Maturity Date" rather than "Stated Maturity Date"; the two terms are synonymous.

[12] The Note Principal Balance is defined as the amount of initial principal *minus* the amount of principal paid to Noteholders. Ex. 5 (Indenture Supplement), § 2.01, at 3-5, 9.

[13] The Invested Amount is defined as the initial principal *minus* the principal paid to the Noteholders *minus* unreimbursed investor charge-offs. Ex. 5 (Indenture Supplement), § 2.01, at 7. The Collateral is essentially equal to the Invested Amount *plus* the Spread Accounts.

12

the concept of Invested Amount with the "principal" owed on the Notes. Under the terms of the Indenture Supplement, unreimbursed charge-offs reduce the Invested Amount—a concept used to calculate the periodic distributions to Noteholders and the amounts allocated as Collateral. Thus, unreimbursed charge-offs reduce the periodic distributions to Noteholders, and reduce the amount of Collateral securing the Notes. But nothing in the transaction documents indicates that such reductions can be equated with write-offs of the actual principal owed under the Notes.[14]

The FDIC also argues that, when considered in context, the "entire unpaid principal amount" phrase relied upon by Millennium should be understood as limited to the Invested Amount or Collateral. In relevant part, the Class C Notes state:

> NextCard Credit Card Master Note Trust, a Delaware business trust (herein referred to as the "Issuer"), for value received, hereby promises to pay to CEDE & CO., or registered assigns, subject to the following provisions, a principal sum of UP TO FIFTY-SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($57,500,000) payable in an amount equal to the aggregate amount, if any, payable from the Collection Account in respect of principal on the Notes pursuant to Section 4.04 of the Indenture Supplement. The entire unpaid principal amount of this Note shall be due and payable on the earlier of the Stated Maturity Date and the Redemption Date, if any. The principal sum of the Rule 144A Global Notes and the Regulation S Global Notes shall not exceed $57,500,000 (unless otherwise permitted pursuant to the Indenture). The Issuer will pay interest on the Class C Notes with respect to each Interest Period in accordance with Sections 4.02 and 4.04 of the Indenture Supplement and will pay principal, if any, due on the Class C Notes on each Distribution Date in accordance with Sections 4.01, 4.03 and 4.04 of the Indenture Supplement. Such principal of and interest on this Note shall be paid in the manner specified on the reverse hereof.

---

[14] Furthermore, the principal distribution provisions in Section 4.04(c) of the Indenture Supplement during the Early Amortization Period provide for payments of allocated funds until the "Note Principal Balance has been paid in full." Ex. 5 (Indenture Supplement), § 4.04(c)(ii)-(v), at 21. If unreimbursed charge-offs actually reduced the principal owed under the Notes, then these distribution provisions would have provided for payments only until the Invested Amount had been paid in full.

Ex. M. (Series 2000-1 Class C Note); Ex. N (the language in the Series 2001-1 Class C Note is very similar). The first sentence in the passage states that a principal sum of *up to* $57,500,000 shall be payable in an amount equal to the aggregate amount of principal payable pursuant to Section 4.04 of the Indenture Supplement. The payments under Section 4.04 of the Indenture Supplement are limited by the concept of Invested Amount. The FDIC argues that the "unpaid principal" in the second sentence of the passage is therefore similarly limited by the Invested Amount. But this argument fails to recognize that the two sentences refer to two *separate* obligations of the Issuer: (1) to make periodic payments of principal as required by Section 4.04 of the Indenture Supplement, and (2) to pay unpaid principal on the Final Maturity Date.[15] Limitations on the first obligation do not necessarily apply to the second.

Another textual clue strongly indicates that the "entire unpaid principal amount" in the Notes refers to the Note Principal Balance. The Class C and Class D Notes state: "The entire unpaid principal amount of this [] Note shall be due and payable on the earlier of the Stated Maturity Date *and the Redemption Date*, if any." Ex. M, Ex. N (Class C Notes); Ex. 19 (Class D Note) (emphasis added). Thus, the same concept of "entire unpaid principal amount" should apply to both the Final Maturity Date and the Redemption Date. Although Redemption Date is not explicitly defined, it appears to refer to a date on which the Issuer exercises an "optional redemption" of the Notes prior to the Final Maturity Date. Section 7.01 of the Indenture Supplement, which deals with such optional redemptions, allows the Issuer to redeem the Notes under certain circumstances by paying

---

[15] Indeed, if the "principal amount" in the second sentence merely referred to the sum of principal payments mandated under Section 4.04 mentioned in the first sentence, it is difficult to see how there could ever be any "*unpaid* principal amount" on the Final Maturity Date (barring a breach of contract whereby the Issuer refused to make principal payments as mandated by Section 4.04).

14

off the Note Principal Balance (as well as interest due). *See* Ex. 5 (Indenture Supplement), § 7.01(d), at 32-33.[16] This indicates that the Note Principal Balance—and not some lesser amount based on Invested Amount or Collateral—was also the "entire unpaid principal amount" due and payable on the Final Maturity Date.[17]

For these reasons, I conclude that the transaction documents unambiguously indicate that the "entire unpaid principal amount" due and payable upon Final Maturity under the Notes was equal to the Note Principal Balance.

## B. The Recourse Nature of the Notes

Having determined that the Note Principal Balance was due and payable on the Final Maturity Date, the Court must next address the Noteholders' ability to collect upon that obligation. In particular, the Court must determine whether the Noteholders may collect unpaid principal from: (1) only the Collateral, or (2) any assets of the Issuer.

This issue reflects the parties' disagreement as to whether the Notes are "recourse notes"

---

[16] In other words, the Issuer could not redeem the Notes merely by paying to Noteholders the Invested Amount (which includes reductions due to investor charge-offs) plus amounts in the Spread Accounts; the Issuer could redeem only by paying off the Note Principal Balance (which does *not* include reductions due to investor charge-offs).

[17] Other provisions relating to acceleration of maturity provides further support for Millennium's position. After an Event of Default, the Noteholders were entitled to accelerate the maturity of the Notes and to make the "unpaid principal amount of such Notes . . . immediately due and payable." Ex. 2 (Master Indenture), § 5.03, at 35. Section 4.04 of the Indenture Supplement provides that, following an Event of Default and acceleration of maturity, a certain portion of finance charge collections "up to the outstanding Note Principal Balance" could be treated as principal collections to be distributed to Noteholders. Ex. 5 (Indenture Supplement), § 4.04(a)(viii), at 20. This allocation provision indicates that the "unpaid principal amount" due and payable upon an acceleration of maturity was equal to the Note Principal Balance, and not merely the Invested Amount. This lends further support to Millennium's claim that the Note Principal Balance was due on the Final Maturity Date itself.

(defined in Black's dictionary as "note[s] that may be satisfied upon default by pursuing the debtor's other assets in addition to the collateral securing the note[s]") or "nonrecourse notes" ("note[s] that may be satisfied upon default only by means of the collateral securing the note[s], not by the debtor's other assets"). *Black's Law Dictionary* 1086 7th ed. 1999). The Noteholders say that the instruments in suit are recourse notes. The FDIC says they are nonrecourse notes.

The Master Indenture, in a section captioned "LIMITED RECOURSE," states: "The obligation of the Issuer to make payments of principal of, interest on and other amounts with respect to, the Notes is limited by recourse only to the Collateral." Ex. 2 (Master Indenture) at 2 (the "Limited Recourse Provision"). This provision seems to clearly show that the Noteholders' right to collect unpaid principal is limited to the Collateral.

But other provisions in the transaction documents provide the Noteholders with an "absolute and unconditional" right to obtain principal that is due and payable. The Master Indenture states:

> Section 5.08. Unconditional Rights of Noteholders to Receive Principal and Interest. Notwithstanding any other provision in this Indenture, each Holder of a Note shall have the right which is absolute and unconditional to receive payment of the principal of and interest in respect of such Note as such principal and interest becomes due and payable and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Noteholder.

Ex. 2 (Master Indenture), § 5.08, at 40. In addition, the Class C Notes (but *not* the Class D Notes) state:

> No reference herein to the Indenture and no provision of this Class C Note or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Class C Note at the times, place, and rate, and in the coin or currency herein prescribed.

Ex. M, Ex. N (Class C Notes).

16

Millennium contends that this "absolute and unconditional" right entitles it to collect unpaid principal from the Issuer's *assets*, not simply from the Collateral, because under New York law "[a]n absolute and unconditional right of payment cannot be limited to a particular source of funds." Millennium's Memorandum of Law Regarding Contractual Construction ("Millennium's Suppl. Br.") at 3 n.2. *See* N.Y. U.C.C. § 3-105(b)(2) ("A promise or order is not unconditional if the instrument . . . states that it is to be paid out of a particular fund or source . . .)[18]; *Hibbs v. Brown*, 82 N.E. 1108, 1110 (N.Y. 1907) ("an order or promise to pay out of a particular fund is not unconditional") (quoting the Negotiable Instruments Law); *Bluegrass Inv., Inc. v. Hodges*, 555 N.Y.S.2d 78, 79 (1st Dep't 1990) (same, quoting U.C.C. § 3-105(b)(2)). The FDIC correctly observes that these definitions of an "unconditional" obligation to pay arise in the context of negotiable instruments, governed by Article 3 of the New York Uniform Commercial Code; and that the Notes in this case are investment securities governed by Article 8 of the New York Uniform Commercial Code, not Article 3. *See* May 27, 2008 Tr. at 43-45. Thus, there is no statutory requirement that these Notes contain an unconditional obligation to pay, which may not be limited to a particular source. But the FDIC has not demonstrated that the plain meaning (under New York

---

[18] This provision in the New York Uniform Commercial Code follows Section 3-105(b)(2) of the original Uniform Commercial Code. The Revised Uniform Commercial Code, however, reversed the original rule and states that "[a] promise or order is not made conditional . . . because payment is limited to resort to a particular fund or source." Revised U.C.C. § 3-106(b)(ii). The official comment to the revised provision explains: "Under Section 3-106(a) a promise or order is not made conditional because payment is limited to payment from a particular source or fund. This reverses the result of former Section 3- 105(2)(b). There is no cogent reason why the general credit of a legal entity must be pledged to have a negotiable instrument. Market forces determine the marketability of instruments of this kind. If potential buyers don't want promises or orders that are payable only from a particular source or fund, they won't take them, but Article 3 should apply." Revised U.C.C. § 3-106 official comment 1. However, New York State has not adopted Revised Article 3 of the Uniform Commercial Code.

17

law) of a borrower's "absolute and unconditional" promise to pay, if used in an investment security, is any different from the meaning of that phrase when used in the context of negotiable instruments. Thus, these provisions appear to indicate that the Class C Notes are recourse notes.

In interpreting contract terms, "the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency." *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1991) (citations and quotations omitted). Accordingly, the parties make various attempts to reconcile these seemingly inconsistent provisions.

## 1. Millennium's Recourse Theory

Millennium argues that the facial inconsistency between the Limited Recourse Provision and Section 5.08 of the Master Indenture is resolved by the "trumping" language in the latter provision, which applies "[n]otwithstanding any other provision in this Indenture." Ex. 2 (Master Indenture), § 5.08, at 40.

The Second Circuit has held that such trumping clauses override other inconsistent provisions. In *International Multifoods Corp. v. Commerical Union Insurance Co.*, 309 F.3d 76, 90-91 (2d Cir. 2002), the Second Circuit reviewed conflicting provisions in an insurance contract for a shipment of cargo. The ship and its cargo were arrested by the Russian government, and the cargo was later appropriated by local Russian authorities. The issue was the value of the cargo that could be recovered under the plaintiff's insurance policy. The contract contained a free-of-capture-or-seizure clause ("FC & S clause"), which stated: "Notwithstanding anything herein contained to the contrary this insurance is warranted free from . . . capture, seizure, arrest, restraint . . . and the consequences thereof . . . whether in time of peace or war and whether lawful or otherwise." The insurer argued that this provision excluded the seized cargo from coverage. But Section 13(a) of the

18

insurance policy provided that "[a]ll goods and/or merchandise shipped, except as may be hereinafter especially provided, are insured . . . [a]gainst all risk of physical loss or damage from any external cause (excepting risks excluding by the F.C. & S . . . warrant[y] unless covered elsewhere herein), irrespective of percentage." And Section 29 of the insurance policy specifically covered "takings at sea, arrests, restraints and detainments of all kings, princes or people of what nation, condition or quality soever." The party seeking coverage argued that the phrase "unless covered elsewhere herein" in Section 13(a) effectively limited the force of the FC & S clause. In light of these conflicting provisions, the Second Circuit held:

> Because the FC & S clause begins with the phrase "[n]otwithstanding anything herein contained to the contrary," we hold that the District Court properly granted summary judgment to IINA [the insurer]. Such language means that the FC & S clause trumps any other provisions of the IINA Policy. This fact is important because the argument advanced by CU [the party seeking coverage] (and by Multifoods in the District Court below) is not without some force; it is virtually impossible to ascribe meaning to the "unless covered elsewhere herein" of Section 13(a) unless one views it as an attempt to limit the scope of the FC & S clause. CU's proposed explanation of the "unless covered elsewhere herein" is problematic because it effectively would eviscerate the FC & S clause entirely. Still, absent the "[n]otwithstanding anything herein contained to the contrary" language of the FC & S clause, the tension between the FC & S clause and the "unless covered elsewhere herein" language arguably would rise to the level of ambiguity warranting denial of summary judgment. However, because the FC & S clause alone among the relevant provisions applies notwithstanding anything else in the contract, we need not resolve the ambiguities surrounding the purpose of the language of Section 13(a). The FC & S clause by its terms overrides any inconsistent language elsewhere in the IINA Policy. Because the FC & S clause by its terms plainly excludes coverage for the seizure of Multifoods' cargo, and because it trumps all other relevant provisions of the IINA Policy, we affirm the grant of summary judgment to IINA.

*Id.* at 90-91. Thus, the FC & S clause, by virtue of its trumping language, overrode the other provisions in the contract (despite the fact that the "unless covered elsewhere herein" phrase in

19

Section 13(a) was likely intended as an attempt to limit the scope of the FC & S clause).

In the case at bar, Section 5.08 of the Master Indenture states:

> Unconditional Rights of Noteholders to Receive Principal and Interest. *Notwithstanding any other provision in this Indenture*, each Holder of a Note shall have the right which is absolute and unconditional to receive payment of the principal of and interest in respect of such Note as such principal and interest becomes due and payable and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Noteholder.

Ex. 2 (Master Indenture), § 5.08, at 40. Thus, Millennium argues that, by the plain meaning of its terms, Section 5.08 trumps the terms of the Limited Recourse Provision.

Nonetheless, "[a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992). It is difficult to imagine that the drafters of the Master Indenture intended to include the Limited Recourse Provision, only to render it meaningless by virtue of Section 5.08. In light of this principle of interpretation, Millennium suggests that the Limited Recourse Provision simply "reflects the pass-through nature of the Notes prior to the maturity date," Millennium's Memorandum of Law in Response to NextBank Receiver's Cross-Motion for Summary Judgment ("Millennium's Opp'n Br.") at 9, as the payments prior to the Maturity Date mandated by Article IV of the Indenture Supplement were based on collections from Receivables and were limited by the Invested Amount and Collateral. But nothing in the actual text of the Limited Recourse Provision—"The obligation of the Issuer to make payments of principal of, interest on and other amounts with respect to, the Notes is limited by recourse only to the Collateral"—indicates that it applies only prior to the Maturity Date. Such a temporal limitation cannot reasonably be read into the provision.

20

A more plausible reconciliation of the provisions is suggested by Millennium's argument that Section 5.08 does not completely prohibit nonrecourse notes, but that such notes required the consent of the Noteholders. *See* Millennium's Suppl. Br. at 10. Section 5.08 states that each Noteholders' absolute and unconditional right to principal that is due and payable "shall not be impaired *without the consent of such Noteholder*." Ex. 2 (Master Indenture), § 5.08, at 40 (emphasis added). On this reading, Section 5.08 trumps the Limited Recourse Provision but does not render it completely meaningless; rather, Section 5.08 *conditions* the applicability of the Limited Recourse Provision upon the consent of the Noteholders. Furthermore, Millennium's argument continues, such consent was given by the Class D Noteholders because the Class D Notes specify that "the Noteholder, by its acceptance of this Note, agrees that it will look solely to the property of the Trust allocated to the payment of this Note for payment hereunder . . . ." Ex. 19 (Class D Note).[19] The Class C Notes contain no such terms. In stark contrast, the Class C Notes state:

> No reference herein to the Indenture and no provision of this Class C Note or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Class C Note at the times, place, and rate, and in the coin or currency herein prescribed.
>
> . . . [N]othing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Class C Note.

Ex. M; Ex. N (Class C Notes). These quoted provisions do *not* appear on the Class D Notes. The Class C Notes do state: "The Class C Notes are subject to all terms of the Indenture." Ex. M, Ex.

---

[19] Millennium states: "Indeed, such a provision could be construed as the express 'consent' for the Class D Noteholders as required under Section 5.08 of the Indenture to permit the [] Limited Recourse Provision to apply to the Class D Notes." Millennium's Suppl. Br. at 10.

N (Class C Notes). But to the extent that this phrase incorporates the Limited Recourse Provision of the Master Indenture, such effect is trumped by the later statement that "nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Class C Note." *Id.*

During oral argument, the FDIC contended that, in any event, Class C Noteholders *did* expressly consent to limited recourse because the Class C Notes state:

> Anything herein to the contrary notwithstanding, except as expressly provided in the Transaction Documents, neither any owner of a beneficial interest in the Issuer, nor any of its partners, beneficiaries, agents, officers, directors, employees or successors or assigns shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on, or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in this Class C Note or the Indenture. The Holder of this Class C Note by the acceptance hereof agrees that, except as expressly provided in the Transaction Documents, the Holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom . . . ."

Ex. M, Ex. N (Class C Notes). Thus, the Class C Noteholders could not directly sue "any owner of a beneficial interest in the Issuer," including NextBank and now the FDIC, to recover amounts due under the Notes. But this provision is inapplicable to the present dispute because the Noteholders are pursuing the assets of the *Issuer*, not the FDIC.[20] And the above-cited language from the Class

---

[20] As noted above, the FDIC claimed that the Transferor Interest was "a portion of the receivables as to which NextBank retained ownership." FDIC Br. in Support of Cross-Mot. for S.J. at 5. If this were so, then the Noteholders' attempt to recover funds from the Transferor Interest portion of the Receivables would constitute a prohibited attempt to exercise recourse against the assets of the FDIC, a beneficial owner of the Issuer. But the Court has rejected the FDIC's characterization because the transaction documents plainly establish that the Issuer "owns" all the Receivables. Ex. 2 (Master Indenture) at 1, Ex. 3 (Transfer and Servicing Agreement) at 15 (the Transferor "conveyed to the Issuer all of its right, title and interest in, to and under the Receivables."). The FDIC does not "own" a portion of the Receivables; rather, it possesses a right to receive Transferor Interest payments from the Issuer.

22

C Notes is immediately followed by the statement that "nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Class C Note." Ex. M, Ex. N (Class C Notes). Thus, the language cited by the FDIC does not constrain the Noteholders' ability to recover principal from the Issuer's assets.

The Indenture Supplement provides that: "On the [] Final Maturity Date, the right of the [] Noteholders to receive payments from the Issuer will be limited solely to the right to receive payments pursuant to Section 5.05 of the Indenture." Ex. 5 (Indenture Supplement), § 7.02, at 33. Section 5.05 of the Master Indenture sets forth remedies for an Event of Default. Millennium argues that this provision further supports the recourse nature of the Notes because it permits the Indenture Trustee and the Noteholders to "institute Proceedings . . . for the collection of all amounts then payable on the Notes . . ., enforce any judgment obtained, and collect from the Issuer and any other obligor upon such Notes moneys adjudged due" and to "take any other appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series"; neither of these possible remedies imposes any explicit limitation based on Invested Amount or Collateral.[21]

Thus, under Millennium's interpretation of the contract's recourse provisions: (1) Section 5.08 of the Master Indenture provides for recourse obligations, unless the Noteholders consent to limited recourse; (2) application of the Limited Recourse Provision was thus conditioned upon

_____

[21] The third remedy option, however, is explicitly limited by the Invested Amount: it allows the Indenture Trustee to "cause the Issuer to sell Principal Receivables in an amount equal to the Invested Amount with respect to the accelerated Series and the related Finance Charge Receivables" under certain circumstances. Ex. 2 (Master Indenture), § 5.05(a)(iii).

23

Noteholder consent; (3) the Class D Noteholders consented to limited recourse by the acceptance of their Notes; (4) the Class C Noteholders did not consent to limited recourse, and thus possess recourse notes; and (5) Section 5.05 permits the Class C Noteholders to collect amounts adjudged due and payable from the assets of the Issuer.

## 2. The FDIC's Limited Recourse Theory

The Limited Recourse Provision clearly states that the Issuer's obligation to pay principal and interest on the Notes is limited by recourse to the Collateral. The FDIC argues that Section 5.08 of the Master Indenture does not conflict with or undermine the plain meaning of the Limited Recourse Provision because Section 5.08 has an entirely different purpose and effect. In particular, the FDIC contends that the purpose of Section 5.08 is to protect individual Noteholders from having the core payment terms of the transaction *modified* by a majority of Noteholders—and that it does not serve to require that those core terms include full recourse.

Section 5.08 of the Master Indenture is a boilerplate provision; it is very similar to Section 508 of the Model Debenture Indenture Provisions adopted by the Corporate Debt Financing Project of the American Bar Association.[22] In analyzing Section 5.08's purpose, the FDIC draws upon the American Bar Foundation's *Commentaries on Model Debenture Indenture Provisions* (1971) ("*Commentaries on Indentures*"), as well as explanations of the purpose behind Section 316(b) of

_____

[22] Section 508 of the Model Debenture Indenture Provisions reads: "Unconditional Right of Debentureholders to Receive Principal, Premium and Interest. Notwithstanding any other provision in this Indenture, the Holder of any Debenture shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and interest on such Debenture on the respective Stated Maturities expressed in such Debenture (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder." *See* American Bar Foundation's *Commentaries on Model Debenture Indenture Provisions,* 234 (1971).

24

the Trust Indenture Act, 15 U.S.C. § 77ppp(b). Millennium claims that this analysis improperly resorts to extrinsic parol evidence, rather than the plain meaning of the text of the contract. The Second Circuit, however, has on several occasions looked to the American Bar Foundation's *Commentaries on Indentures* for guidance when analyzing boilerplate indenture provisions. *See in re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 139-40 (2d Cir. 2005); *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71-72 (2d Cir.1988); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048-50 (2d Cir.1982); *see also Feder v. Union Carbide Corp.*, 530 N.Y.S.2d 165, 167 (App. Div. 2d Dep't 1988). Reliance upon such commentary is consistent with the Second Circuit's approach of analyzing contracts, under New York law, "as viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996).

In this case, the *Commentaries on Indentures* explains that "[t]he provisions of Section 508 are mandatory in a qualified indenture by reason of TIA [Trust Indenture Act] § 316(b)."[23] The FDIC then emphasizes that the purpose of Section 316(b) of the Trust Indenture Act was to

---

[23] Section 316(b) of the Trust Indenture Act states: "Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder, except as to a postponement of an interest payment consented to as provided in paragraph (2) of subsection (a) of this section, and except that such indenture may contain provisions limiting or denying the right of any such holder to institute any such suit, if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver, or loss of the lien of such indenture upon any property subject to such lien." 15 U.S.C. § 77ppp(b).

"prohibit[] use of an indenture that permits modification by majority securityholder vote of any core term of the indenture, i.e., one affecting a securityholder's right to receive payment of the principal of or interest on the indenture security on the due dates for such payments," and that Section 316(b) was enacted based on "concern about the motivation of insiders and quasi-insiders to destroy a bond issue through insider control." *UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 452 (S.D.N.Y. 1992); *In re Bd. of Dirs. of Telecom Argentina, S.A.*, 2008 WL 2220682, at *6 (2d Cir. May 29, 2008) (stating that Section 316(b) of the Trust Indenture Act "protects the holder of a bond issued under a qualified indenture from majority-imposed impairment of its rights"); *see also* Mark J. Roe, *The Voting Prohibition in Bond Workouts*, 97 Yale L.J. 232, 250-52 (1987) (explaining that Section 316(b)'s prohibition of "majority action clauses," which allow modification by majority action of core terms of the bond, was "prompted by a fear that insiders could gain control of a bond issue and destroy it for the insiders' benefit" and concern that "individual bondholders received poor information about the company's prospects"). Based on these materials, I think the FDIC has persuasively demonstrated that the purpose of "Section 316(b) is to require the consent of bondholders of an indenture security for any changes in payment terms," FDIC's Suppl. Br. at 6; and clearly this is one of the key purposes behind Section 508 of the Model Debenture Indenture Provisions and Section 5.08 of the Master Indenture.

However, the effects of Section 508 of the model provisions and Section 5.08 of the Master Indenture are not necessarily limited solely to the purposes behind Section 316(b), as the former contractual provisions contains terms beyond what is explicitly required by the statute. In particular, model Section 508 and Section 5.08 of the Master Indenture state that the securityholder "shall have the right *which is absolute and unconditional* to receive payment of the principal of [] and interest"

26

due on the note or debenture, while Section 316(b) does not explicitly require that the right to receive payment be "absolute and unconditional." Consistent with the plain meaning of the "absolute and unconditional" right to payment set forth in the model provision, the *Commentaries on Indentures* explains: "The purpose of such provisions [in Section 508] was to assure the negotiability of the debentures by making certain that the promise to pay contained therein was unconditional." *Commentaries on Indentures*, 234. Thus, it appears that model Section 508, as originally applied, would have, *inter alia*, prevented the promise to pay in the indenture from being limited to a certain source of funds, since such a promise would not have been "unconditional" and the negotiability of the debenture would have been compromised.

While recognizing that the original purpose and effect of provisions such as Section 5.08 included an unconditional promise to pay, the FDIC contends that "[n]ow that securities such as the Notes are governed by Article 8 of the Uniform Commercial Code [rather than Article 3, which covers negotiable instruments], negotiability is no longer an issue." FDIC's Suppl. Br. at 6. The FDIC correctly observes that under current law, there is no requirement that indenture securities be negotiable instruments; and in this sense, negotiability is indeed "no longer an issue." But in my view, the consequence of these developments in the law is that indentures *need not include terms providing for an unconditional promise to pay*—not that indenture terms containing unconditional promises to pay may simply be read out of the contract.[24] Thus, the drafters of the Master Indenture

---

[24] The situation would be different in a contract governed by the law of a state that had adopted Revised Article 3 of the Uniform Commercial Code. Under the Revised Article 3, "[a] promise or order is not made conditional . . . because payment is limited to resort to a particular fund or source." Revised U.C.C. § 3-106(b)(ii). Thus, a provision like model Section 508 would no longer bar a promise to pay from a particular source because the definition of "absolute and unconditional" had changed in that state.

27

could have modified the language of Section 508 of the model provision so as to provide and protect a right to principal and interest limited by recourse to the Collateral (rather than an "absolute and unconditional" right to principal and interest due) without running afoul of the Trust Indenture Act or any negotiability requirements, but they neglected to do so. And this Court is constrained to give effect to the plain meaning of the provisions that appear in the contract, even if they were improvidently included.

A similar analysis applies to the provision in the Class C Note that states: "No reference herein to the Indenture and no provision of this Class C Note or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Class C Note at the times, place, and rate, and in the coin or currency herein prescribed." Ex. M, Ex. N (Class C Notes). This provision is nearly identically to the sixth paragraph in the Model Debenture Forms appearing in the *Commentaries on Indentures*.[25] The commentary states the purpose of this provision is to affirm that "the obligation of payment on each debenture is absolute and unconditional," notes that "[t]he affirmation of the sixth paragraph has been particularly beneficial in ensuring that bearer debentures comply with the Negotiable Instruments Law," and explains that "the sixth paragraph has the effect of ensuring compliance with certain of the other requisites of negotiability, including the requirement that the instrument must contain an unconditional promise to pay a sum certain in money on demand or at a fixed or determinable future time." *Commentaries on Indentures*, 129. Thus, as originally applied, this model provision would

---

[25] The sixth paragraph of the Model Debenture Form states: "No reference herein to the Indenture and no provision of this Debenture or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of (and premium, if any) and interest on this Debenture at the times, place, and rate, and in the coin or currency, herein prescribed." *Commentaries on Indentures*, 129.

28

have prevented the promise to pay in the indenture from being limited to certain source of funds—since such a promise would not have been "unconditional" and the negotiability of the debenture would have been compromised. Because "negotiability is no longer an issue" for securities governed by Article 8 of the N.Y. U.C.C., there is no need for such notes to include provisions like paragraph six of the Model Debenture Form. (The Class D Notes in this case, for example, do not include such a provision.) But that does not mean that provisions of this nature, when they are still included, may simply be read out of the contract.[26]

As for the remedies available to the Noteholders under Section 5.05 of the Master Indenture, the FDIC emphasizes that the third option allows the Indenture Trustee to "cause the Issuer to sell Principal Receivables *in an amount equal to the Invested Amount* with respect to the accelerated Series and the related Finance Charge Receivables." Ex. 2 (Master Indenture), § 5.05(a)(iii) (emphasis added). It is unclear why this foreclosure remedy would be limited to the Invested Amount if the Noteholders in fact had recourse to all the Issuer's assets. Furthermore, Section 5.05(d) explains that if Noteholders exercise the foreclosure remedy in Section 5.05(a)(iii), then "such Series shall no longer be entitled to any allocation of Collections or other property constituting the Collateral under this Indenture and the Notes of such Series shall no longer be Outstanding." *Id.*, § 5.05(d). Thus, the remedies in Section 5.05 arguably provide greater support to the FDIC than to Millennium. Nonetheless, I do not think these aspects of Section 5.05 can override the trumping recourse language in Section 5.08 and on the Class C Note.

---

[26] Once again, the situation would be different in a contract governed by the law of a state that had adopted Revised Article 3 of the Uniform Commercial Code. In that case, a provision like model paragraph six would no longer bar a promise to pay from a particular source because the definition of "absolute and unconditional" had changed in that state.

## IV. DECISION

This Court agrees with Judge Huvelle that "[a]s a matter of law, the transaction documents must be construed as one agreement," and even if "this were a question of fact, which it is not, the Court would find that NextBank and BNY intended the transaction documents to be construed together as a single agreement," *Bank of New York v. FDIC*, 453 F.Supp.2d at 100; in the case at bar, the Noteholders are be substituted for BNY.

This is, in short, a contract case. Appellate courts instruct trial courts to construe a contract "in accord with the parties' intent," and the best evidence of their intent "is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d at 569. Easy enough to say: but difficult to apply when the parties' writings are as convoluted and opaque as those in this case. Presumably the transaction documents were drafted by lawyers. The record does not reveal their number or identity. With all *due* respect (I emphasize the adjective), if those lawyers had been law students and submitted these documents as a final exercise in a Pass/Fail course on Clarity in Legal Writing, their grade would not begin with a "P."

In consequence, counsels' contentions in their briefs are able to leap from one of the transaction documents to another and back again, feats of gymnastic advocacy made possible by the fact that, as Judge Huvelle noted: "Each of the transaction documents contained repeated provisions of the other documents, making the documents interdependent." *Bank of New York v. FDIC*, 453 F.Supp.2d at 100. The contractual interpretation the Noteholders extract from one of the bundle of documents is countered by the FDIC's extraction from another, and vice-versa. I have considered all the parties' contentions, and analyze most of them in Parts I and III of this Opinion. In the view I take of the case, however, I need not further pursue all these arguments. I think that the Second

30

Circuit's opinion in *International Multifoods Corp. v. Commercial Union Insurance Co.*, 309 F.3d 76 (2d Cir. 2002), points the way to the correct result in this case.

The extended quotation from *Multifoods* appearing in Part III.B.1. is highly instructive. The Court of Appeals, in determining the extent of coverage under a policy of marine insurance, held that the introductory phrase to the FC & S clause excluding coverage reading "*Notwithstanding anything herein contained to the contrary*" controlled, because that phrase meant that the clause it introduced "trumps any other provisions of the IINA Policy," even though other provisions in the policy could be read with "some force" as "an attempt to limit the scope of the FC & S clause," thereby creating coverage. *Id*. at 90 (emphasis added).

So too in the case at bar. Section 5.08 of the Master Indenture, captioned "Unconditional Rights of Noteholders to Receive Principal and Interest," reads:

> *Notwithstanding any other provision in this Indenture*, each Holder of a Note shall have the right which is absolute and unconditional to receive payment of the principal of and interest in respect of such note a such principal and interest becomes due and payable and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Noteholder.

(emphasis added). And, in like vein, the faces of the Class C Notes (but not the Class D Notes) recite:

> *No reference herein to the Indenture and no provision of this Class C Note or of the Indenture* shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Class C Note at the times, place, and rate and in the coin or currency herein prescribed.

(emphasis added). The effect of the italicized language in the Master Indenture and the Class C Notes is to constitute the Notes as recourse notes, since a noteholder's absolute and unconditional

31

right to demand and receive payment in full of all principal and interest cannot be reconciled with the concept of a non-recourse note.

The FDIC locates in this bundle of transaction documents bases for arguing that the parties intended the Notes to be non-recourse: principally, of course, the Limited Recourse Provision on page 2 of the Master Indenture. But the most that can be said for this provision is that it is inconsistent with Section 5.08 of the Master Indenture and the face of the Class C Notes; and the italicized language I have quoted in those documents performs the same "trumping" function with respect to the nature of the Notes that the identical language in *Multifoods* performed with respect to the exclusion of coverage in the insurance policy.[27]

How did this state of affairs come about? Perhaps it is plausible to suppose that since Section 5.08 of the Master Indenture may be denigrated as a boilerplate provision intended only to prevent majority action modifications to payment terms, the drafters could not really have intended it to override the Limited Recourse provision. But I do not think that a case like *Multifoods* allows the FDIC to urge such a speculation or the Court to accept it.

In *Multifoods,* the Second Circuit concluded its analysis by saying:

> Because the FC & S clause by its terms plainly excludes coverage for the seizure of Multifoods' cargo, and because it trumps all other relevant provisions of the IINA Policy, we affirm the grant of summary judgment to IINA.

309 F.3d at 91. In the case at bar, because Section 5.08 of the Master Indenture and the face of the Class C Notes plainly entitle the Noteholders to payment in full, and because they trump all other

---

[27] To the extent the FDIC argues that, as the result of a combination of circumstances and provisions, the Class C Noteholders should be regarded as consenting to the impairment of their right of full recovery, as contemplated by the final phrase of Section 5.08 of the Master Indenture, I reject the argument as unpersuasive.

32

relevant provisions in the transaction documents, the motions of First Millennium, Inc., Millennium

Partners, L.P., and RMK Advantage Fund for summary judgment are GRANTED, and the cross-

motion of the Federal Deposit Insurance Corporation for summary judgment is DENIED.

Counsel for the Noteholders are directed, on or before March 13, 2009, to settle an Order and

Judgment consistent with this Opinion on ten (10) calendar days' notice.

It is SO ORDERED.

DATED: New York, N.Y.
        February 24, 2009

_____
CHARLES S. HAIGHT, JR.
Senior United States District Judge